## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROSHAN KUMARA MALALGODAPITIYA     :
       :
*On Behalf of Himself and*        :
*All Others Similarly Situated*        :
       :
    Plaintiff,        :
       :
      v.        :     Case No.: RJL-CV-06-430
       :
JAAM, LTD.        :
t/a PARKLANE CLEANERS, *et al*.        :
       :
    Defendants.        :

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

As a matter of law, and assuming as true the facts shown most favorable to Defendants, Roshan Kumara Malalgodapitiya ("Kumara"), was not an administrative or executive employee or otherwise exempt from overtime pay for any reason. Kumara seeks partial summary judgment as to liability only and requests that this Court hold as a matter of law that Kumara was not an exempt employee under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 *et seq*. ("FLSA").

## I.     INTRODUCTION

### A.     PROCEDURAL POSTURE

On or about March 8, 2006, Kumara filed the above-captioned action, on his own behalf and on behalf of other similarly situated colleagues[1], against his former employers seeking the recovery of unpaid minimum and overtime wages under the FLSA and for other relief. Defendants filed an Answer to Kumara's First Amended Complaint on November 2, 2006,

---

[1]     Kumara's Motion to Facilitate Identification and Notification of Similarly Situated Employees is pending with the Court.

asserting a number of affirmative defenses, including that Kumara is exempt from being paid overtime because he falls under the "administrative" or "executive" exemptions to the FLSA's requirement of overtime pay to employees who work in excess of forty (40) hours in a given work week.

The parties have exchanged written discovery and have taken depositions. In light of the uncontested facts, Kumara is entitled to summary judgment on the issue of liability on his FLSA overtime claim as a matter of law. Pursuant to Local R. 16.3(d), by agreement of the parties, and the Court's approval, discovery has been extended through January 15, 2006.

## B. BACKGROUND

In 2000, Kumara came to this country from Sri Lanka looking for a better life.[2] Sometime later, Kumara learned that JAAM, Ltd t/a Parklane Cleaners (the "store") and its owners were hiring immigrants who did not yet have a work permit. Kumara Aff. at ¶ 3. Defendants paid Kumara, as well as the other illegal immigrants, cash without keeping any records of the transactions. *See* Deposition of Faramarz Mamdouhi, excerpts of which are attached as Exhibit 2 ("Mamdouhi Depo"), at 23, 36. No federal, state, or local taxes, or social security were deducted from Kumara's pay. *Id.* Although Defendants required Kumara to work in excess of forty hours every week, they refused to pay him overtime pay, as required by law.

Simply put, § 7(a)(1) of the FLSA requires that employers pay <u>all</u> employees time and a half for work over forty hours in a week, 29 U.S.C. § 207(a)(1), unless that employee falls into a narrowly defined exemption. The FLSA is quite unequivocal as to an employer's overtime pay obligation. As shown more fully below, Defendants blatantly exploited Kumara and his

---

[2]    During the time of his employment with Defendants, Defendants were sponsoring Kumara's application for residents alien ("green card") status, which Defendants rescinded when Kumara left their employment. Kumara has since received a temporary work permit and a social security card. Aff. at Roshan Kumara Malalgodapitiya at ¶ 2, attached hereto as Exhibit 1 ("Kumara Aff.").

immigration status by requiring him to work from dawn to dusk every day, six or seven days a week, while paying him a pittance - far below minimum wage - with no overtime. Defendants calculated that they would never be caught, and that, in any event, Kumara would be too compromised by virtue of his precarious immigration status to protest.

## II.    STATEMENT OF MATERIAL FACTS

In or around November or December 2001, Defendants hired Kumara as a "manager"[3] of the Parklane Dry Cleaning Store. *See* Defendants Interrogatory Answers at No. 6, attached hereto as Exhibit 3 ("Def. Ans."). Kumara did not have any prior dry cleaning or management experience. Mamdouhi Depo. at 7 and 22.  At the time of Kumara's hire, Defendants already had a store manager, Mangelo Mawilmada ("Mani"), who was being paid nine dollars ($9.00) per hour. *Id.* at 35.  Yet, Defendants were going to pay Kumara, also a purported "manager," $325.00 per week. *See* Exhibit 3 at Def. Ans. No. 6. Given that Kumara was scheduled to work fifty-eight (58) hours per week, Kumara's alleged pay came out to $5.60 per hour.[4]  *Id.*

Kumara's schedule was to be as follows:

| | |
|---|---|
| Monday | 7:00 a.m. to 7:00 p.m. (with lunch break) |
| Tuesday | 7:00 a.m. to 7:00 p.m. (with lunch break) |
| Wednesday | 7:00 a.m. to noon or 1:00 p.m. |
| Thursday | 7:00 a.m. to 7:00 p.m. (with lunch break) |
| Friday | 7:00 a.m. to 7:00 p.m. (with lunch break) |

---

[3]    Kumara disputes that he was hired as a manager, or that he ever had any managerial or supervisory role.  In fact, Kumara disputes other material facts noted in Defendants' discovery responses and depositions as well.  For purposes of this Motion, however, even assuming the truth of Defendants' assertions, Defendants cannot meet their heavy burden of carrying these affirmative defenses.

[4]    Kumara contends that he worked seventy (70) hours per week.  *See* Pl. Ans. to Interrog, attached hereto as Exhibit 4 at Ans. No. 8. Given that this Motion seeks partial summary judgment on the issue of liability only, this factual issue will remain for resolution by the jury at trial in any event and need not be resolved at this stage.

Saturday          8:00 a.m. to 6:00 pm (with lunch break)

Exhibit 3 at Def. Ans. No. 9.

Although Kumara was apparently the manager, in June 2004, Defendants hired Utuh Rahardja Putra ("Utuh") to manage the front of the store. Mamdouhi Depo. at 39. Utuh was employed from June 2004 through April 2005. *Id.*

The following was a typical day for Kumara at the Parklane Dry Cleaning Store[5]:

| | |
|---|---|
| 6:30am: | Opened the store (turn off security alarm, turn on boiler, put cash and change in the register) |
| 7:00am – 10:00am: | Tagged clothes for dry cleaning |
| 7:45am: | Wrote down the times of when everyone arrived at the store and called co-owners Fred or Mathew to inform them if anyone was late or did not show up |
| 8:00am – 9:00am: | Owners alternated coming to the store.  They would check the computers, take money from the previous day, answer customer complaints, and take care of employee problems |
| 10:00am – 4:30pm: | Finished tagging same day service items; assembled dry cleaning and folded shirts |
| 4:30pm – 7:00pm: | Checked to see that the delivery person took the proper dry cleaning and laundry; helped in front of store |
| 7:00pm: | Closed store (hide money; turn on security alarm, lock door) |

Kumara Aff. at ¶ 4.

Sometime in 2002, Kumara asked Defendants whether they would sponsor him for his green card. Mamdouhi Depo. at 56-57.  Defendants initially said they would not help him, but in July 2002 changed their mind. *Id.*; *See also* Application for Alien Employment Certification ("App. Emp. Cert."), attached hereto as Exhibit 5. Mamdouhi, under the penalties of perjury, indicated that Defendants would hire Kumara as an Alterations Tailor and would pay Kumara

---

[5]     Although Defendants deposed Kumara, they did not ask him about his typical day.  This information is useful for the Court because it shows the big picture of what Kumara did throughout the day.

$12.00 per hour regular pay and $18.00 per hour for overtime. Ex. 5. Kumara did not at that time, and still does not know, how to alter clothing.[6]  Mamdouhi Depo. at 64.

For the entire duration of his employment with Defendants, Kumara was paid in cash. Mamdouhi Depo. at 36-38. Defendants did not withhold taxes or social security from his pay. *Id.* Defendants did not maintain payroll records - as required by law - of how much they paid Kumara or how often.[7] *Id.* at 12-13.

Kumara performed a wide variety of non-office tasks at the dry cleaner.  He was never provided with a job description or a formal title. Mamdouhi Depo. at 8, 18. In fact, Defendants did not maintain employment manuals, training manuals or any other document which related to Kumara's duties or responsibilities.  *See* Defendants' Responses to Document Requests, attached hereto as Exhibit 7, at Response No. 2. The following exchange at Mamdouhi's deposition describes more fully Kumara's duties:

> Q:  Did he open and close the store on a daily basis?
> A:  Yes.
>
> Q:  Did he reset the alarm system?
> A:  Yes.
>
> Q:  Did he fix machines?
> A:  Well, fix in the sense if something was very simple, he could find out, he would.
>
> Q:  Did he put change in the cash register?
> A:  Yes.
>
> Q:  Did he turn on the computer?
> A:  Yes.

---

[6]     Mamdouhi testified, however, that although Kumara was the "manager" of the store, he understood that once Kumara received his green card (after presumably learning how to be a tailor), he would become an alterations tailor and receive a significant pay raise from his pay as store "manager." Mamdouhi Dep at 59-60.

[7]     Mehdi Nezam, co-owner, acknowledged that he maintained a book in which he recorded the pay given to Kumara, but that he destroyed this evidence of payment.  *See* Deposition of Mehdi Nezam, excerpts of which are attached as Exhibit 6 ("Nezam Depo"), at 15-16.  Thus, a spoliation instruction on this issue will be appropriate at trial.

Q:      Did he set the boiler?
A:      Well, he would come in and turn on the boiler, yes.

Q:      Did he deal with customer?
A:      Yes.

Q:      Did he keep track of other employees' time?
A:      Correct.

Q:      Did he interact with vendors and repair people?
A:      He was in charge to make sure we had enough supplies for the store and service was needed for machine service, he would call directly and talk to directly to the mechanics.

Q:      The short answer is yes, he did deal with vendors and repair people?
A:      Yes.

Q:      Did he, would he contact you or Mr. Nezam and report things going on?
A:      Usually, if it was that important, he could not, something he really needed our attention, he would.

Q:      Did he assemble dry cleaning?
A:      Sometimes if we don't have enough help, he would but not on a regular basis.

Q:      Did he operate the dry cleaning machines when operators were on vacation and Saturdays?
A:      Yes, once in a while, take care of the store in safe place until he give it to Mehdi the next day.

Q:      Did he set the security alarm and close the building down each evening?
A:      Yes.

Mamdouhi Depo. at 26-28.

## III.    LEGAL ARGUMENT

### A.    Summary Judgment

The standard for summary judgment is well-known to this Court. Summary Judgment shall be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Chelates Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). The burden is upon

the non-moving party to demonstrate that there are material facts in dispute. *Chelates,* 477 U.S. at 324. There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, all evidence and inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [his] favor." *Anderson,* 477 U.S. at 248; *see also Bayer v. United States Dept. of Treasury,* 956 F.2d 330, 333 (D.C.Cir.1992).

A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50.

**B.     The Employer's Affirmative Defense Must Be Proved by Clear and Affirmative Evidence**

Section 207(a)(1) of the FLSA provides that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." Section 13(a)(1), however, provides an exemption from the overtime pay requirements for persons employed in a bona fide executive, administrative, or professional capacity. 29 U.S.C. § 213(a)(1). Defendants admit

Kumara worked in excess of forty hours per week. Exhibit 3 at Def. Ans. No. 9. Thus, the remaining question is whether Kumara's work duties fell within any one of these narrow exemptions.   The answer is undoubtedly no.

The FLSA was "enacted with the purposes of protecting employees and imposing minimum labor standards upon covered employers, including the payment of a specified minimum wage and overtime pay for covered employees."  *Ball v. Memphis Bar-B-Q Co.*, 228 F.3d 360, 363 (4th Cir. 2000).  Congress' reasoning behind enacting the overtime pay provisions of the FLSA "was twofold: (1) to spread employment by placing financial pressure on employers to hire additional employees rather than have current employees work longer hours, and (2) to compensate employees for the burden of working long hours."  *Conway v. Takoma Park Vol. Fire Dept., Inc.*, 666 F. Supp. 786, 790 (D. Md. 1987) (citing *Walling v. Helmerich & Payne*, 323 U.S. 37, 40 (1944)).  Moreover, "[t]he Supreme Court has directed that the Act must be construed 'liberally to apply to the furthest reaches consistent with congressional direction.'"  *Roy v. County of Lexington*, 141 F.3d 533, 540 (4th Cir. 1998) (quoting *Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 296 (1985)).

Significantly, the "employer's claims must be proved by *clear and affirmative evidence* or the employee must be given coverage under the Act." *Roney v. U.S.A.,* 790 F.Supp 23 (D.D.C. 1992) (emphasis added); *See also Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993) ("[e]mployers must prove by *clear and convincing evidence* that an employee qualifies for exemption.")  *Id.* (emphasis added).  As this Court is well aware, this is the highest standard of proof that can be imposed on a party in a civil proceeding.  In attempting to make this showing, "the employer must prove that any particular employee meets every requirement before the employee will be deprived of the protection of the Act." *Roney*, 790 F.Supp. at 26 *quoting*

*Mitchell v. Williams*, 420 F.2d 67, 69 (8th Cir. 1969); *See also Dalheim v. KDFW-TV*, 706 F. Supp. 493, 501 (N.D. Tex. 1988), *aff'd*, 918 F.2d 1220 (5th Cir. 1990) ("[t]he employer has the burden of establishing by affirmative evidence all the necessary requirements of the exemption"). *See also Pezzillo v. General Tel. & Elec. Information Sys., Inc.*, 414 F. Supp. 1257, 1268 (M.D. Tenn. 1976) ("The employer must show that each employee meets every requirement of the claimed exemption.").

As stated by the United States District Court for the Northern District of New York, "[t]hese exemptions [from the overtime pay requirements] are *narrowly construed against the employers* seeking to assert them and their application limited to those [employees] *plainly and unmistakably within their terms and spirit*, with the burden of establishing such applicability resting squarely upon the employer's shoulders." *Bennett v. Progressive Corp.*, 225 F. Supp.2d 190, 215 (N.D.N.Y. 2002) (citations omitted) (emphasis added). *See also Roy*, 141 F.3d at 540; *Shockley*, 997 F.2d at 24 ("Courts construe exemptions to the FLSA narrowly 'in order to further Congress' goal of providing broad federal employee protection.'" (citation omitted)).

### C.    Kumara's Duties Do Not Fall Under The Administrative Exemption

With that as a backdrop, the uncontested facts demonstrate that Kumara is not an exempt "administrative" employee. In order to prevail under this exemption, Defendants must prove by clear and convincing evidence that (1) Kumara's salary was at a rate of not less than $455 per week;[8] (2) his primary duty[9] was the performance of office or non-manual *work* directly related to the management or general business operations of the employer or the employer's customers;

---

[8]    Kumara contends that his pay was not more than $250.00 per week. For purposes of this Motion only, however, Kumara accepts Defendants' assertion that he was earning at least $455 per week.

[9]    The term primary duty means the principal, main, major or most important duty that the employee performs. 29 C.F.R. § 541.700(a).

and (3) his primary duty included the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200.[10]

### 1. Kumara's Primary Duty Did Not Directly Relate to Management or General Business Operations

As stated by the Secretary of Labor's regulations ("Regulations"):

> *Work* directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. 29 U.S.C. § 541.201(b) (emphasis added).

The following examples described by the Regulations illustrate what work duties fall under the administrative exemption, and demonstrate that Kumara's work duties did not fall under the administrative exemption:

> An employee who *leads a team* of other employees assigned to complete major projects for the employer (such as purchasing, selling or closing all or part of the business, negotiating a real estate transaction or a collective bargaining agreement, or designing and implementing productivity improvements) …

> An *executive assistant or administrative assistant* to a business owner or senior executive of a *large business* generally meets the duties requirements for the administrative exemption if such employee, without specific instructions or prescribed procedures, has been delegated authority regarding matters of significance.

> *Human resources managers* who formulate, interpret or implement employment policies and management consultants who study the operations of a business and propose changes in organization generally meet the duties requirements for the administrative exemption.  However, personnel clerks who "screen" applicants to obtain data regarding their minimum qualifications and fitness for employment generally do not meet

---

[10]     On April 23, 2004, the Department of Labor approved new overtime regulations, which became effective on August 23, 2004.  For simplicity sake, Kumara will follow the new regulations because the "general criteria for employees employed in a bona fide administrative capacity are essentially the same under the August 2004 Regulations as under the [former] regulations." *Robinson-Smith v. Geico,* 323 F.Supp.2d 12, 18 (D.D.C. 2004).

the requirements for the administrative exemption.  Such personnel clerks typically will reject all applicants who do not meet minimum standards for the particular job or for employment by the company. The minimum standards are usually set by the exempt human resources manager or other company officials, and the decision to hire from the group of qualified applicants who do me meet the minimum standards is similarly made by the exempt human resources manager or other company officials. …
29 U.S.C. § 541.203(c)(d), and (e) (emphasis added).

Given the above examples as a backdrop, Kumara's work duties cannot be construed to fall under the administrative exemption.  Kumara did not lead a team of employees assigned to complete a major project, he was not an administrative or executive assistant in a large business, and he did not formulate, interpret or implement employment policies.  Indeed, Defendants did not have any written policies to be implemented.  Exhibit 7 at Resp. No. 2.

Moreover, as noted above, work is defined as:

directly relat[ing] to management or business operations [that] typically includes tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; and legal and regulatory compliance." 29 U.S.C. § 541.201(b).

With the possible exception of a small amount of incidental purchasing or procurement duties, Kumara was not involved in any of these activities.

Kumara worked at the dry cleaning store from dawn to dusk practically every day.  By virtue of that schedule, Kumara became familiar with various aspects of the dry cleaning process. That familiarity, however, in no way transformed him into an exempt administrative employee, although Defendants magically hope and pray it somehow does.

Moreover, *none* of the work duties which Defendants claim Kumara performed were directly relate to Defendants' general business operations. Ultimately, this "directly related" test is only "met if the employee engages in running the business itself or determining its overall

course or policies, *not just in the day-to-day carrying out of the business' affair*s." *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002) (internal quotation marks omitted) (emphasis added).   When one compares the *type of work* that meets this exemption with the actual work duties performed by Kumara, it becomes self-evident that Kumara was "not running the business" or "determining its overall course or policies." Rather, Kumara's work duties, as acknowledged by Defendants, at best describe someone who was carrying out mundane day-to-day operations, such as opening and closing the store, turning on machines, putting cash in the registers, and calling Defendants when problems arose.

### 2. Kumara's Primary Duty Did Not Include the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance

Assuming *arguendo,* that his Court finds that Kumara's primary duty directly related to management or general business operations, Defendants must also prove by clear and convincing evidence that Kumara exercised discretion and independent judgment in the performance of his primary duties for Defendants. 29 C.F.R. § 541.200(a)(3). As stated in the Regulations:

> In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work performed.  29 C.F.R. § 541.202(a).

The Regulations further outline factors to consider when evaluating whether an employee exercises discretion and independent judgment.  The following are some of the factors noted:

> whether the employee has *authority to formulate, affect, interpret, or implement* management policies or operating practices; whether the employee carries out *major assignments* in conducting the operations of the business; whether the employee performs work that affects business operations to a *substantial degree*; whether the employee has authority to commit the employer in matters that have *significant financial impact*, whether the employee has authority to *waive or deviate from established policies and procedures without prior approval,* whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or

expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievance. 29 C.F.R. 541.202(b) (emphasis added).

Applying these factors, it is simply not fathomable or credible to believe that Kumara's *primary* work duties included the exercise of discretion and independent judgment with respect to matters of significance.

Moreover, if an employee is simply using his or her skills -- in contrast to the exercise of discretion and independent judgment -- it does not matter how adept that employee is in the performance of his primary duties; he or she is *not* exempt.  29 U.S.C. § 541.202(e).  In other words, an employee's level of expertise in applying his or her skills is simply not the relevant inquiry.  Kumara submits he acquired some skills, such as opening and closing the store, putting cash in the register, or perhaps dealing with customers or contractors on occasion, by virtue of his presence at the store for 60 plus hours each week.  The following case law illustrates the difference between merely using ones skills and the exercise of discretion and independent judgment.

In *Martin v. Penn Line Service, Inc.*, 416 F. Supp. 1387 (W.D. Pa. 1976), even someone as highly trained and sophisticated as a helicopter pilot was found to be entitled to overtime compensation.  In so ruling, the U.S. District Court for the Western District of Pennsylvania set forth the following relevant passage regarding the application of the administrative exemption:

> [T]he record [does not] support any basis to conclude that plaintiffs performed any administrative duties or engaged in the exercise of any discretion or independent judgment. *On the contrary, plaintiffs performed their duties through the reliance on their skills and techniques acquired by their training and experience. Without a doubt, plaintiffs' decisions and performance were guided within the context of those skills and training.* However, all decisions or judgments which would necessarily involve a major policy change could only be taken after consultation with their superior.

*Id*. at 1390 (emphasis added).

Another example is the case of *Dalheim v. KDFW-TV*, 706 F. Supp. 493 (N.D. Tex. 1988), *aff'd*, 918 F.2d 1220 (5th Cir. 1990), where the court held that highly trained and educated newscast producers and directors were not exempt administrative employees. According to the court, the producers were non-exempt because they

> use techniques, procedures, repetitious experiences, and specific standards to perform their work. Many of the standards and procedures that they follow are dictated by station management or are otherwise known generally in the industry. The producers utilize their knowledge in applying these techniques or procedures as part of a skilled, integrated KDFW production team.

*Id*. at 508. As for the directors, the court explained its basis for finding that they were non-exempt as follows:

> The "calling" of a newscast involves highly developed skills, executed under pressure and arduous time constraints, but does not involve discretion and independent judgment in the sense envisioned by the regulations. The director plans the sequence of the cameral shots, the timing and sequence of special effects, and performs preproduction work. Station management and outside consultants, however, prescribe the "look" of the set and general policy concerning how the newscast is to be presented to the viewer.

*Id*. at 508-09.

Clearly, Kumara may have become adept at his work duties through *training* and *experience*. *See Martin*, 416 F. Supp. at 1390. However, it strains credulity beyond the breaking point to contend that Kumara's decisions or judgments could affect a major policy change at Defendants' store. Indeed, Mamdouhi admits that if something was "important," Kumara was expected to call one of the owners. Mamdouhi Depo. at 27. Moreover, Kumara did not, for example: (1) have the authority to formulate, affect, interpret, or implement management policies; (2) carry out major assignments in conducting the operations of the business; (3) have the authority to commit the employer in matters that have significant financial impact; or (4)

have the authority to waive or deviate from established policies and procedures without prior approval. *See* 29 C.F.R. 541.202(b).

### 3. Plaintiffs' Primary Duties Did Not Consist of Office or Non-Manual Work

Finally, with respect to the administrative exemption, Defendants must prove by clear and convincing evidence that Plaintiffs' primary duties consisted of the performance of "office or non-manual work." 29 C.F.R. § 541.200(a)(2). Kumara did not work in an office setting, nor did he perform office work. In addition, Kumara's primary duties did not consist of performing non-manual work either. Indeed, Kumara primarily performed manual tasks such as opening and closing the store, resetting the alarm system, fixing machines, putting change in the cash register, turning on the computer, setting the boiler, assembling dry cleaning and setting the security alarm at the close of business. Mamdouhi Depo. at 26-28. Even assuming, at moments, he performed non-manual tasks, those tasks were not his "principal" or "main" duty he performed throughout the day. *See* 29 C.F.R. § 541.700(a).

The facts set forth above, and the legal principles applicable to those facts, clearly demonstrate that Defendants cannot meet their burden of proving by clear and convincing evidence that Kumara's *primary* duties satisfy the administrative exemption. Accordingly, Kumara respectfully requests that this Honorable Court hold as matter of law that his duties did not fall under the FLSA's administrative exemption.

### D. Kumara's Duties Do Not Fall Under The Executive Exemption

In order to prevail under this exemption[11], Defendant must prove by -- again, clear and convincing evidence -- that: (1) Kumara was compensated on a salary basis at a rate of not less than $455 per week; (2) his primary duty was management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) he customarily and regularly directed the work of two or more other employees; and (4) he had the authority to hire or fire other employees or he could make suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees which input was given particular weight. 29 C.F.R. § 541.100. <u>Each of these elements must be satisfied</u>. *See Davis v. Mountaire Farms, Inc.*, 453 F.3d 554, 557 (3rd Cir. 2006) ("since the requisite characteristics of executive employment are stated in the conjunctive rather than the disjunctive, it is necessary, for an employee to be exempt as one employed in an 'executive capacity,' that the employee be shown to meet all of the administrative requirements for such exemption.")

### 1. Kumara Was Not In Management

As stated by the Regulations, "management" includes, but is not limited to activities such as:

---

[11]     The Department of Labor's regulations governing the executive exemption changed more dramatically than the administrative exemption on August 23, 2004.  However, the change was more in form than substance.  Prior to August 23, the Regulations set forth a short or long test, depending on whether the employee earned more or less than $250 per week.  Here, the parties agree that Kumara was at least making $250 per week.  For simplicity sake, Kumara will follow the new regulations because, for purposes of this Motion, the elements are practically the same. *See Johnson v. Target Corporation,* 2006 WL 572014 (E.D. Tenn 2006) (unpublished decision). (the "amended regulations *essentially contain the factors previously used in the 'short test' with two modifications*: 1) the addition of the fourth factor previously concerning authority to affect the status of other employees and 2) the increased requirement of $455 salary per week. *See also* 69 Fed.Reg.22122, 22131 (Apr. 23, 2004) (stating that the amended regulations adopt 'the current short test requirements plus a third objective requirement taken from the long test.'" (emphasis added).

interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances, disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or property; planning and controlling the budget; and monitoring or implementing legal compliance measures. 29 C.F.R. § 541.102

Defendants will likely argue that Kumara was involved in: (1) directing the work of other employees; (2) appraising employees' productivity and efficiency for the purpose of recommending promotions; (3) handling employee complaints and grievances; (4) disciplining employees; and (5) planning the work.

These items can be discarded simultaneously. Defendants state in conclusory fashion that Kumara was supervising other employees and had the authority to make recommendations with respect to hiring, firing, advancement, promotion, or other changes of status of other employees. Exhibit 3 at Ans. No. 14. When pressed in his deposition to elaborate on these duties, Mamdouhi stated that Kumara would

take care of all the problems with the employees and if someone wouldn't do their job properly he would instruct them to do so and if he keep telling them, they don't listen, he would talk to us and we would take action. If someone was doing a good job, he would tell us the person is doing a good job and we have to give a raise. Mamdouhi Depo at 28.

As stated above, however, a nonmoving party, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999). Rather, the nonmoving party must present *specific facts* that would enable a reasonable jury to find in its favor. *Id.* If the evidence "is

merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50.

When pressed further for specific facts and probative evidence regarding Kumara's alleged status as an "executive," Mamdouhi was unable to provide anything beyond conclusory statements and generalities. The following is the relevant excerpt from his deposition:

Q:    Which were the employees where he said they were not doing a good job?
A:    *I can't recall who*, so many different occasions, *I can't recall*, any particular person.

Q:    How many employees were there, at any given time working at the Parklane store?
A:    Probably nine to ten people.

Q:    You are telling me you can't remember any instance him talking to you about an employee who wasn't working well?
A:    *I don't remember names*, so many times persons don't do this, that, didn't listen to this and wasn't happy with it, we discussed it with him and corrected the problem. *I don't remember each person*.

Q:    You mentioned he would talk to you about people doing well, you need to pay them more money?
A:    Yes.

Q:    Who were the employees that he talked to you about who were doing a good job and you needed to pay more?
A:    *I don't remember anybody in particular*. There were occasions he talked about people, how they were doing and to give them a raise.

Q:    Do you remember when those conversations took place, spread out? All at the beginning? All at the end?
A:    Spread out, *I cannot tell exactly the time*.

Q:    Did he ever tell you there was one who needed to be fired?
A:    He never said fire, someone doesn't do the job, what to do, discuss it. He never mentioned to fire anybody, but he was telling me and Mehdi, my partner, that they were not doing their job right and if it wasn't corrected, we would fire the person, but it never happened.

Q:    No one was fired from the store while Kumara was working there?
A:    I mean I don't fire people. *I don't recall* firing anybody.
…

Q:     You said Kumara never told you to fire someone and never brought in anybody to be hired. Correct?

A:     As far as I remember, but as far as firing, he did say to fire people that would not listen, but we worked it out.  I went and talked to them and find out the problem and correct it, they didn't get to the point to fire. He did talk about sometimes this guy should not be working in the back because he create problems, *I don't remember exactly*.

Q:     Did he have authority to hire someone, as well?

A:     If it was the right person, I am sure he would have consulted us, we were also consulted.

Q:     You are saying he had authority to hire people without telling anybody in advance?

A:     If he needed someone, it never happened.

Q:     If never happened - -  he never hired or fired anybody you are aware of?

A:     No.

Mamdouhi Depo. at 28-34 (emphasis added).

Defendants make bald assertions and unfounded conclusions that Kumara was involved in directing other employees, recommending promotions, handling complaints, disciplining employees, or planning work.  In fact, there is not a scintilla of probative evidence and no specific facts which would permit a reasonable jury to find that Kumara was an exempt "executive." Indeed, when repeatedly asked for specific examples, Mamdouhi's response was "I can't recall."

Further, Defendants' post-hoc claim in litigation that Kumara was a "manager" is irrelevant as a matter of law.  The Regulations state: "[t]he exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part." 29 U.S.C. § 541.2.  Job titles are meaningless.

### 2. Kumara Did Not Customarily and Regularly Direct the Work of Two or More Employees

Defendants cannot show that Kumara customarily and regularly directed the work of two or more employees. As stated, Mani was managing the store when Defendants purportedly hired Kumara as a manager. Mamdouhi Depo. at 35. Further, Defendants admit they hired Utuh to manage the front of the store and deal with customers. *Id*. at 39. There is no evidence in the record to suggest that Kumara directed the work of any employee, much less *customarily* and *regularly* directed such work.

### 3. Kumara Did Not Have the Authority to Hire or Fire Other Employees

Lastly, Kumara did not have the authority to hire or fire other employees or make suggestions and recommendations on hiring, firing or any other change of status of other employees which were given particular weight. 29 C.F.R. § 541.100(4). Interestingly, Defendants never claim Kumara had the <u>actual</u> authority to hire or fire other employees. Instead, Defendants contend that Kumara had "the authority to *make recommendations* with respect to hiring, firing…" Exhibit 3 at Ans. No. 14. Beneath this naked conclusory assertion, however, there is no probative evidence which would permit a reasonable jury to find for Defendants on this issue.

First, Kumara never hired or fired anybody. Mamdouhi Depo. at 34. The question then becomes: did Kumara make any such recommendation and, if so, did they carry any "particular weight"? The Regulations are helpful on this point, and describe the following factors to be considered:

> whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. 29 C.F.R. § 541.105.

Defendants strike out on this point as well.  First, there is no written description of Kumara's job duties.  Beyond Defendants unsupported statement that Kumara's job responsibilities entailed making recommendations as to hiring, firing, advancement, promotions, or other changes of status of other employees, there is no evidence in the record from which a reasonable jury could find that this was part of Kumara's job duties.  As noted, Defendants cannot cite to a single specific example where Kumara made even one recommendation as to hiring, advancement or promotion.

Moreover, assuming Kumara actually recommended that Defendants fire someone, Defendants admit that it carried little weight.

> Q:    You said Kumara never told you to fire someone and never brought in anybody to be hired. Correct?
> A:    As far as I remember, but as far as firing, *he did say to fire people that would not listen, but we worked it out*.  *I went and talked to them and find out the problem and correct it, they didn't get to the point to fire*. He did talk about sometimes this guy should not be working in the back because he create problems, I don't remember exactly.

Mamdouhi Depo. at 32.

Given that Defendants cannot recall any specific examples of Kumara making any recommendations, it is impossible for Defendants to meet their heavy burden of showing by clear and convincing evidence that Kumara's recommendations carried particular weight.  This is made even more apparent in light of Mamdouhi's admission that, in the one vague instance he does seem to remember, he did not follow Kumara's suggestion.

## IV.    CONCLUSION

The facts set forth above, and the legal principles applicable to those facts, demonstrate that Defendants cannot meet their burden of proving by clear and convincing evidence that Kumara's primary duties satisfy either the administrative or executive exemption from overtime

pay required by the FLSA. Accordingly, Kumara respectfully requests that this Honorable Court

hold as matter of law that his duties did not fall under either of these narrow exemptions.

Respectfully submitted,

_____/s/_____

Philip B. Zipin, Bar No.:  367362
The Zipin Law Firm, LLC
8403 Colesville Road, Suite 610
Silver Spring, Maryland 20910
301-587-9373
pzipin@zipinlaw.com

Counsel for Plaintiff