Case 1:06-cv-00430-RJL   Document 20-2   Filed 12/19/2006   Page 1 of 15

**FARAMARZ MAMDOUHI - OCTOBER 24, 2006**

ROSHAN KUMARA MALALGODAPITIYA
On Behalf of Himself and
All Others Similarly Situated
vs.
JAAM, LTD.
t/a PARKLANE CLEANERS, et al.

Page 1 to Page 73

Condensed Transcript and Concordance
Prepared By

*PRECISE REPORTING SERVICES*
8804 Sumner Grove Drive
Laurel, Maryland 20708
Phone (301) 210-5092
Toll Free (866) 847-3351
Fax (301) 210-5094
www.precisereportingservices.com



*Precise Reporting Services*
(301) 210-5092
*Serving MD, D.C. & VA*

DEPOSITION OF FARAMARZ MAMDOUHI
Conducted on October 24, 2006

---

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE DISTRICT OF COLUMBIA
3  -------------------------------x
4  ROSHAN KUMARA MALALGODAPITIYA    x  Case No. 1:06
5  On Behalf of Himself and         x
6  All Others Similarly Situated    x  CV 00430 (RJL)
7      Plaintiff,                   x
8      v.                           x
9  JAAM, LTD.                       x
10 t/a PARKLANE CLEANERS, et al.,   x
11     Defendants.                  x
12 -------------------------------x
13              Tuesday, October 24, 2006
14              Silver Spring, Maryland
15 The deposition of FARAMARZ MAMDOUHI called for
16 examination by counsel for Plaintiffs in the
17 above-titled matter, pursuant to notice, at The
18 Zipin Law Firm, 8403 Colesville Road, Silver
19 Spring, Maryland, before Jonell Easton, notary
20 public at 10:00 a.m., when were present on behalf
21 of respective parties:

Page 2

1  On behalf of the Plaintiffs:
2      PHILIP B. ZIPIN, ESQUIRE
3      The Zipin Law Firm
4      8403 Colesville Road
5      Suite 610
6      Silver Spring, Maryland 20910
7      301.587.9373
8
9
10 On behalf of the Defendants:
11     GERALD J. EMIG, ESQUIRE
12     Gleason, Flynn, Emig & Fogleman
13     11 North Washington Street
14     Rockville, Maryland 20850
15     301.294.2110
16
17 Also Present:  Mehdi Nezam
18                Roshan Kumara
19
20              - - -
21

Page 3

1              C O N T E N T S
2  WITNESS          EXAMINATION BY COUNSEL FOR
3                   PLAINTIFFS    DEFENDANTS
4  FARAMARZ MAMDOUHI      4           --
5
6
7
8          MAMDOUHI EXHIBITS
9  EXHIBIT                    MARKED
10 No. 1  Answers              19
11 No. 2  Payroll journal      50
12 No. 3  Copy of check        52
13 No. 4  Application          56
14 No. 5  Employer compliance summary    65
15 No. 6  January 4, 2006 letter    68
16         (Exhibits attached.)
17              - - -

Page 4

1              P R O C E E D I N G S
2      Whereupon,
3      FARAMARZ MAMDOUHI
4  was called for examination by counsel for
5  Plaintiffs and, after having been first duly sworn
6  by the notary public was examined and testified as
7  follows:
8      EXAMINATION BY COUNSEL FOR PLAINTIFFS
9      BY MR. ZIPIN:
10 Q.  State your name for the record.
11 A.  Faramarz Mamdouhi.
12 Q.  Spell that for the record, please.
13 A.  F-A-R-A-M-A-R-Z  M-A-M-D-O-U-H-I.
14 Q.  Where do you live, Mr. Mamdouhi?
15 A.  Potomac.
16 Q.  What is the address?
17 A.  17008 Boswell, B-O-S-W-E-L-L, Potomac,
18 Maryland 20054.
19 Q.  How long have you lived there?
20 A.  About 11, 12 years.
21 Q.  Can you tell me where you were born?

1 (Pages 1 to 4)

DEPOSITION OF FARAMARZ MAMDOUHI
Conducted on October 24, 2006

5

1  A. Teheran, Iran.
2  Q. Are you a citizen here?
3  A. Yes, I am.
4  Q. You know the plaintiff in this case,
5  Roshan?
6  A. Yes.
7  Q. We will call him Kumara?
8  A. Sure.
9  Q. Where did you first meet Kumara?
10  A. He was brought in for employment to my
11  store in November or December of 2001 by one of his
12  friends.
13  Q. Your store?
14  A. Parklane Cleaners, where he later stayed.
15  Q. Parklane with a E on the end?
16  A. Yes.
17  Q. Who was it that brought him in?
18  A. Mani, his friend.
19  Q. Do you know where Kumara is from?
20  A. Sri Lanka.
21  Q. When he was brought in, was he looking for

6

1  a job?
2  A. Yes, he was desperate and his friend
3  brought him.
4  Q. What kind of job was he looking for?
5  A. He didn't have, was looking for a job
6  because he needed money at the time because he was
7  unemployed and couldn't find a job, and he was
8  bringing him.
9  Q. Do you know how long he had been in the
10  country at that time?
11  A. I don't know exact. I know he had a job
12  somewhere in an island because of his situation
13  after 2001.
14  Q. Ireland?
15  A. In island or somewhere.
16  Q. I-R-E-L-A-N-D?
17  A. Yes.
18  Q. What was Mani's role in this --- why was
19  Mani ---
20  A. Because he was his friend and he asked me,
21  has a friend, wants to help him if it is, if

7

1  possible, I have to see what he can do for us.
2       We were looking for someone to run the
3  store and help the other guy because we were not
4  there all the time, one, so to get familiar and I
5  guess work.
6  Q. You don't know Mani before?
7  A. Yes, Mani was working for us.
8  Q. Was he an employee?
9  A. I rely on.
10  Q. Was he acting as a translator?
11  A. No, he was talking himself, he was with
12  us.
13  Q. What happened at the first meeting, did
14  you offer a job to Kumara?
15  A. I remember he came and I said the job I
16  have, you know, is going to be someone who would
17  do, learn all the aspects of this management,
18  managing the store and I know you don't have
19  experience.
20       And he said he would be able to learn it
21  and willing to do it.

8

1       I said it will be a lot of hours.
2       He said no problem.
3       And we went from there.
4  Q. When did you actually hire him?
5  A. I don't remember exactly how long after,
6  probably a week or two after that.
7  Q. What was his job title?
8  A. We had him as manager training probably
9  something like that since I didn't tell him about,
10  what job title, I told him he has to know
11  everything in the store, to be able to run the
12  store.
13  Q. Did you discuss the hours?
14       You said lots?
15  A. Absolutely.
16  Q. What were the hours you discussed?
17  A. I told him five to six days a week and be
18  given one day off and off on Wednesday and I told
19  if I need him more, I will let him know. Sometimes
20  if need to, we ask him to come in on days that he
21  is not working. That never happened.

DEPOSITION OF FARAMARZ MAMDOUHI
Conducted on October 24, 2006

9

1    I explained a lot of hours, you are given
2    one day off, 7:00 to 7:00 Monday through Friday and
3    8:00 to 6:00, on Saturdays.
4        I told him we would take a break for his
5    lunch also and if he had things to do, he could do
6    his things as long as someone is in the store.
7    Q.  Did you discuss how long a lunch break?
8    A.  We told him usually half an hour, if he
9    takes longer, possible, I said everybody takes half
10   an hour, usually, at the store.
11   Q.  This discussion was before he started
12   work. Right?
13   A.  Yes.
14   Q.  Is it your testimony you told him he would
15   have Wednesdays off every week?
16   A.  Yes.
17   Q.  That means his actual work time, as far as
18   what you are discussing, was Monday, Tuesday,
19   Thursday and Friday 7:00 to 7:00?
20   A.  I don't know exactly Wednesday, a day, I
21   said, I said you can take one day off, I don't know

10

1    exactly Wednesday in the beginning.
2        For a long time, it was Wednesday.
3        Right in the beginning, I can't recall
4    exactly Wednesday or not. I told him he could take
5    one day off. I don't remember exactly what day,
6    but Wednesday was mostly the last two years he
7    worked he was taking one half day or whole day.
8    Q.  Do you know how often he took off the
9    entire day or half a day on Wednesdays?
10   A.  Basically he was talking mostly the whole
11   day until we hired another person for, to help him
12   out and that was the time he was taking the whole
13   day off until the gentlemen left.
14   Q.  Who is this person?
15   A.  Ute, when he left, he had to be by himself
16   and do the job, he had to take only half that day,
17   which was April of 2005.
18   Q.  Ute left in April of 2005?
19   A.  Correct.
20   Q.  That meant Kumara had to work what?
21   A.  Half day on his day off.

11

1    Q.  Were you, yourself, going to Parklane
2    Cleaners on a daily basis?
3        MR. EMIG:  What period of time?
4        MR. ZIPIN:  Talking from the time Kumara
5    was hired, at the beginning, which would have
6    sometime November or December of 2001.
7        MR. EMIG:  Continuing objection.
8        The timeframe is prior to period covered
9    by the claim in this case.
10       I will permit him to answer about the time
11   preceding because it could be relevant because
12   there was no claim for alleged unpaid wages 2001 to
13   2002, I note continuing objection, relevancy.
14       THE WITNESS:  By that time we were going
15   to the store but not two, three hours a day, maybe
16   at the most, in the beginning, then, when he was
17   there only just an hour to 45 minutes to an hour in
18   the morning.
19       BY MR. ZIPIN:
20   Q.  When did that change take place where you
21   started going only 45 minute in the morning?

12

1    A.  Most of the time, when he was in charge of
2    the store, I don't remember the dates exactly.
3    Q.  How do you know what hours Kumara actually
4    worked if you weren't there except 45 minutes?
5    A.  We went on what he told us and there he
6    was and sometimes he wrote his own name in the
7    schedule, the time when he came, what day it was.
8    Q.  Do you have copies of records where he
9    wrote his own name with any time?
10   A.  I don't because we don't keep, I might be
11   able to find it, might, I don't know, but ---
12   Q.  Other than his own records for some time
13   he worked, as you indicated, there were no time
14   records that would indicate his time worked?
15   A.  No.
16   Q.  Why is that?
17   A.  Because I didn't think it was a necessity
18   to do that because he was a guy --- that entire
19   time his schedule was known and he was the one to
20   come and go, I wouldn't really question him about
21   his time.

DEPOSITION OF FARAMARZ MAMDOUHI
Conducted on October 24, 2006

13

1    And the thing he was, you know, coming at
2 certain times and he was telling me what time he
3 leaves, I went by what he told me all the time. I
4 didn't have to keep him to know exactly every day
5 because he wasn't an employee like everybody else
6 because he was in charge.
7    Q. You didn't keep records because he told
8 you and you knew his schedule?
9    A. Yeah, because when I called him or I
10 called the store, he was there. There was no
11 reason for me to write his time every day.
12    Q. The time he was working the same schedule
13 you said 7:00 to 7:00 Monday through Friday expect
14 Wednesday and 8:00 to 6:00 Saturday?
15    A. Correct and lunch break, and he was
16 leaving early some afternoons, he calls he
17 sometimes and not sometimes but he left on a
18 regular basis as one of his coworkers mentioned in
19 the affidavit.
20    Q. Who?
21    A. Mr. Ute.

14

1    Q. Said he left early?
2    A. Sure.
3    Q. Otherwise, you would not know?
4    A. Sometimes I did, sometimes he -- the next
5 day came and there was some stuff I requested and
6 they said he wasn't there, the customer had
7 problems, so I knew it.
8    Q. It was part of Kumara's responsibilities
9 to open and close the store?
10    A. Correct.
11    Q. When he would leave early, who would
12 close?
13    A. Arlene, she was the one.
14    Q. How many times are you aware Arlene closed
15 the store?
16    A. I can't recall how many times.
17    Q. Fewer than ten times?
18    A. Might be, really might be more, I don't
19 know how many times, but she had a key for that
20 reason, if she had to close up.
21    Q. Is Arlene still employed with you, with

15

1 your company?
2    A. Not with my company, but she works at the
3 store.
4    Q. I don't follow. Does that mean you sold
5 the store?
6    A. Yes.
7    Q. When?
8    A. April of 2005, 2006, I'm sorry.
9    Q. Who owns the store now?
10    A. This individual and his wife.
11    Q. What is the name?
12    A. Tom Avakian and his wife.
13    Q. Now operated under the corporate name JAAM
14 Limited?
15    A. Right.
16    Q. Prior to April of 2006, how many dry
17 cleaners did JAMM Limited operate?
18    A. I'm sorry?
19    Q. Prior April of 2006?
20    A. Two stores.
21    Q. One was the Parklane store, correct?

16

1    A. Yes.
2    Q. Where was the other?
3    A. Parkland in Washington, D.C.
4    Q. So it is Parklane with an E and Parkland
5 with a D?
6    A. Correct.
7    Q. Both are in Washington, D.C.?
8    A. Right.
9    Q. Was there a time, in the last three years
10 or four years, when JAAM operated a dry cleaning
11 store in Maryland?
12    A. No.
13    Q. In the last four years, the most that JAMM
14 Limited operated is two stores in Washington, D.C.
15 Right?
16    A. As far as I can, the best I can know, we
17 never in the three years, any operation with JAAM
18 in Maryland or in D.C.
19    Q. During time you had both stores, the
20 Parklane and Parkland stores, what was the average
21 gross sales in those stores for a year?

4 (Pages 13 to 16)

DEPOSITION OF FARAMARZ MAMDOUHI
Conducted on October 24, 2006

Page 17

1    MR. EMIG: Objection.
2    Don't answer. Relevance.
3    BY MR. ZIPIN:
4    Q. There is a requirement for federal labor
5    standards we show this enterprise ---
6    MR. EMIG: He will concede they operated a
7    business in D.C.
8    MR. ZIPIN: That is not the issue.
9    MR. EMIG: I will not permit him to
10   testify about gross receipts.
11   MR. ZIPIN: Check the statutes. We will
12   be back on this question, I can assure you.
13   MR. EMIG: All right.
14   BY MR. ZIPIN:
15   Q. Is it accurate that with the two stores
16   combined your gross sales for a year would be above
17   $500,000?
18   MR. EMIG: You can answer.
19   THE WITNESS: Yes.
20   BY MR. ZIPIN:
21   Q. I don't need an exact number, that would

Page 18

1    be true for 2003, 2004 2005, each year?
2    A. Yes, probably.
3    Q. Now when Kumara came to work, you said he
4    came to work sometime shortly after he met you in
5    November, December of 2001?
6    A. Correct.
7    Q. Did you have a job description?
8    A. Only thing I explained to him he has to
9    learn how to run the store.
10   Q. Did you have a written job description?
11   A. No.
12   Q. Has there ever been a written job
13   description for him?
14   A. No.
15   Q. When he first started working for you, did
16   you have discussion about what he would be paid?
17   A. Yes.
18   Q. What were those discussions?
19   A. I told him I would give him $325 per week.
20   Q. And he agreed to that?
21   A. Of course.

Page 19

1    Q. How many hours was that supposed to cover?
2    A. It wasn't the hours, I told him that the
3    work consists of his running the, learning how to
4    run the store and he takes Wednesday off and the
5    rest he works whatever the hours.
6    Q. How long did you pay him $325 a week?
7    A. If I am not mistaken, up to 2002, at which
8    went up, I have to look at my papers, if you want
9    me to look.
10   Q. Go ahead, check.
11   MR. EMIG: Talking about answers to
12   interrogatories?
13   THE WITNESS: Right.
14   MR. ZIPIN: Before you look, let me show
15   you, you are looking at the same thing I am showing
16   you right here, the answers to interrogatories?
17   MR. EMIG: Yes.
18   MR. ZIPIN: Have this marked.
19   (Mamdouhi Deposition Exhibit No. 1 was
20   marked for identification.)
21

Page 20

1    BY MR. ZIPIN:
2    Q. You have been handed what has been marked
3    Exhibit 1 to your deposition.
4    This is a copy of your interrogatory
5    answers provided to by counsel and let me get you
6    to first turn to the last page or maybe second to
7    last, the page with your signature.
8    A. Correct.
9    Q. That is your signature?
10   A. Yes.
11   Q. You said, I declare under penalties of
12   perjury that the foregoing is true and correct?
13   A. Yes.
14   Q. You swore the answers were true and
15   correct when you provided them to counsel and
16   counsel provided them to me?
17   A. Yes.
18   Q. You wanted me to check when the dates on
19   $325 a week?
20   A. Right up to the spring of 2003.
21   Q. You are looking at answer number six.

Page 25

1  you listed here?
2  A. Correct.
3  Q. All in cash?
4  A. Correct.
5  Q. Why didn't you keep track of the amount
6  you were paying, why is there no paper record of
7  the amounts?
8  A. Because it was a certain amount he was
9  getting paid every week and I know exactly what it
10 was.
11 Q. Including amounts he would take out from
12 the cash register?
13 A. He put a note and we take at the same week
14 if something, stay back, take it without out like
15 that.
16 Q. Are you saying money he took out was also
17 an advance that would be deducted from his pay?
18 A. As I said, not many times, if it was the
19 case, we would take it out next time, whenever, the
20 next pay.
21 Q. If he put in a note saying he took $30,

Page 26

1  the next time he got paid, it would be the amount
2  of regular base less $30?
3  A. Correct.
4  Q. When Mr. Kumara was working for you, I
5  want to ask you some job responsibilities to see if
6  he did those job responsibilities when working for
7  you in charge of the Parklane store, did he open
8  and close that store on a daily basis?
9  A. Yes.
10 Q. Did he reset the alarm system?
11 A. Yes.
12 Q. Did he fix machines?
13 A. Well, fix in the sense if something was
14 very simple, he could find out, he would.
15 Q. Did he put change in the cash register?
16 A. Yes.
17 Q. Did he turn on the computer?
18 A. Yes.
19 Q. Did he set the boiler?
20 A. Well, he would come in and turn on the
21 boiler, yes.

Page 27

1  Q. Did he deal with customers?
2  A. Yes.
3  Q. Did he keep track of other employees'
4  time?
5  A. Correct.
6  Q. Did he interact with vendors and repair
7  people?
8  A. He was in charge to make sure we had
9  enough supplies for the store and service was
10 needed for machine service, he would call directly
11 and talk to directly to the mechanics.
12 Q. The short answer is yes, he did deal with
13 vendors and repair people?
14 A. Yes.
15 Q. Did he, would he contact you or Mr. Nezam
16 and report things going on?
17 A. Usually, if it was that important, he
18 could not, something he really needed our
19 attention, he would.
20 Q. Did he assemble dry cleaning?
21 A. Sometimes if we don't have enough help, he

Page 28

1  would but not on a regular basis.
2  Q. Did he operate the dry cleaning machines
3  when operators were on vacation and Saturdays?
4  A. Yes, once in a while, take care of the
5  store in safe place until he give it to Mehdi the
6  next day.
7  Q. Did he set the security alarm and close
8  the building down each evening?
9  A. Yes.
10 Q. Were there any other job responsibilities
11 Mr. Kumara performed while he was working for you?
12 A. Yes, taking care of all the problems with
13 the employees and if someone wouldn't do their job,
14 properly he would instruct them to do so and if he
15 keep telling them, they don't listen, he would talk
16 to us and we would take action.
17    If someone was doing a good job, he would
18 tell us the person is doing a good job and and we
19 have to give a raise.
20 Q. Which were the employees where he said
21 they were not doing a good job?

DEPOSITION OF FARAMARZ MAMDOUHI
Conducted on October 24, 2006

---

29

1  A. I can't recall who, so many different
2  occasions, I can't not recall, any particular
3  person.
4  Q. How many employees were there, at any
5  given, time working at the Parklane store?
6  A. Probably nine to ten people.
7  Q. You are telling me you can't remember any
8  instance him talking to you about an employee who
9  wasn't working well?
10  A. I don't remember names, so many times
11  persons don't do this, that, didn't listen to this
12  and wasn't happy with it, we discuss it with him
13  and corrected the problem. I don't remember who
14  each person.
15  Q. You mentioned he would talk to you about
16  people doing well, you need to pay them more money?
17  A. Yes.
18  MR. EMIG: Sometimes everything is non
19  verbal, but it doesn't transcribe.
20  THE WITNESS: Thank you.
21

---

30

1  BY MR. ZIPIN:
2  Q. Who were the employees that he talked to
3  you about who were doing a good job and you needed
4  to pay more?
5  A. I don't remember anybody in particular.
6  There were occasions he talked about people, how
7  they were doing and to give them a raise.
8  Q. Do you remember when those conversations
9  took place, spread out? All at the beginning? All
10  at the end?
11  A. Spread out, I cannot tell exactly the
12  time.
13  Q. Did he ever tell you there was one who
14  needed to be fired?
15  A. He never said fire, someone doesn't do the
16  job, what to do, discuss it. He never mentioned to
17  fire anybody, but he was telling me or Mehdi, my
18  partner, that they were not doing their job right
19  and if it wasn't corrected, we would fire the
20  person, but it never happened.
21  Q. No one was fired from the store while

---

31

1  Kumara was working there?
2  A. I mean I don't fire people. I don't
3  recall firing anybody.
4  Q. How did Kumara leave your employment?
5  A. He just walked out himself.
6  Q. You are saying he resigned, he wasn't
7  fired?
8  A. No, he was not.
9  Q. Did Kumara ever bring anybody to you and
10  say this person should be hired to work in the
11  store?
12  A. I don't remember.
13  Q. To be clear, you don't remember him doing
14  anything like that?
15  A. Yes.
16  MR. EMIG: Off the record.
17  (Discussion off the record.)
18  BY MR. ZIPIN:
19  Q. You said Kumara never told you to fire
20  someone and never brought in anybody to be hired.
21  Correct?

---

32

1  A. As far as I remember, but as far as
2  firing, he did say to fire people that would not
3  listen, but we worked it out. I went and talked to
4  them and find out the problem and correct it, they
5  didn't get to the point to fire.
6  He did talk about sometimes this guy
7  should not be working in the back because he create
8  problems, I don't remember exactly.
9  MR. ZIPIN: Take a break.
10  (Discussion off the record.)
11  MR. ZIPIN: The record will reflect my
12  client has arrived and he will be with us at this
13  time.
14  If there are problems from my client's
15  point of view, we may break or reconvene. We will
16  go through as best we can.
17  BY MR. ZIPIN:
18  Q. My client, Kumara, did not have authority
19  to hire or fire anybody at store?
20  A. If it came to it, he did.
21  As I said, it never happened we did that

---

8 (Pages 29 to 32)

DEPOSITION OF FARAMARZ MAMDOUHI
Conducted on October 24, 2006

Page 33

1 numerous times regarding how well or bad someone
2 was doing and corrected the situation and it never
3 got to the point of firing them.
4    Q.  Are you saying my client could have,
5 without consulting with you, fired any employee of
6 the store?
7    A.  Could have because he had authority.
8    Q.  He had authority to fire someone?
9    A.  Yes.
10   Q.  Did he have authority to hire someone, as
11 well?
12   A.  If it was the right person, I am sure he
13 would have consulted us, we were also consulted.
14   Q.  You are saying he had authority to hire
15 people without telling anybody in advance?
16   A.  If he needed someone, it never happened.
17   Q.  It never happened --- he never hired or
18 fired anybody that you are aware of?
19   A.  No.
20      MR. EMIG:  Objection.  Asked and answered
21 about four times.

Page 34

1       You can answer.
2       BY MR. ZIPIN:
3    Q.  Yes, let me be clear.
4       He never hired or fired anybody?  I want
5 to be clear that the answer to this question is he
6 did not hire or fire anybody.  Is that correct?
7    A.  Same as me or Mehdi we never fired anybody
8 at the time because it was not needed to do, so if
9 someone didn't do the job properly and we discuss
10 with them and they didn't follow up, they left
11 themselves or we don't fire them, but he did have
12 the authority to do so.  It never happened.
13   Q.  Is it correct that he never hired or fired
14 anybody?
15   A.  I answered that three times.
16   Q.  Can you give me a yes or no?
17   A.  I said yes.
18   Q.  Prior to Roshan Kumara being hired as
19 manager of the store, who was the manager of
20 Parklane Cleaners?
21   A.  Basically Mani, his friend, was doing a

Page 35

1 lot of work and we were there also as his help, but
2 we were there more than the time he was there in
3 the store.
4    Q.  What was Mani's position?
5    A.  In the beginning, just running the store,
6 but the last few months, he was working, he was
7 just doing the same thing, running the store and
8 doing some of the work that was supposed to be
9 done.
10   Q.  Is Mr. Mani identified in your answers to
11 interrogatories, number two under E says Mani?
12   A.  Yes.
13   Q.  Is it your testimony he was doing the
14 store manager work with you at that time, before
15 Kumara was brought in?
16   A.  Correct.
17   Q.  What was he being paid at that time?
18      MR. EMIG:  Objection.  Relevancy.
19      You can answer.
20      THE WITNESS:  Exactly, I don't remember.
21 I have to go back and see, $9 an hour.

Page 36

1      BY MR. ZIPIN:
2    Q.  Is Mani, today, is he still working for
3 you?
4    A.  Not for me, no.
5    Q.  Is he working at the store?
6    A.  As far as I know, he does.
7    Q.  You said you paid Kumara in cash every two
8 weeks.  Is that right?
9    A.  Correct.
10   Q.  There was never any withholding or taxes
11 or Social Security.  Right?
12   A.  Yes.
13   Q.  How long have you been in the dry cleaning
14 business?
15   A.  Since 1982.
16   Q.  You are familiar with record-keeping
17 requirements of, required of people in business?
18   A.  I thought I did, but apparently, I was
19 wrong.
20   Q.  What do you mean?
21   A.  By not keeping daily schedules, I found

9 (Pages 33 to 36)

DEPOSITION OF FARAMARZ MAMDOUHI
Conducted on October 24, 2006

Page 37

1 out after, you know, called by D.C. pay wages
2 department.
3    Q.  You are saying now you need to keep track
4 of employees who are hourly?
5    A.  Yes.
6    Q.  Do you need to keep payroll records, as
7 well?
8    A.  Yes.
9    Q.  For all employees?
10   A.  Correct.
11   Q.  When did you first became aware you needed
12 to keep payroll records?
13   A.  Yes, when I talked to Ms. Price in D.C.
14 government.
15   Q.  You are saying for 20 years or so you
16 didn't know you had to keep payroll records?
17   A.  Payroll records, we kept payroll company
18 also, have all the forms, but not daily, hourly,
19 what time to what time for two, three years ago,
20 payroll records we always kept.
21   Q.  Were there other employees beside Kumara

Page 38

1 who were paid in cash?
2        MR. EMIG:  Objection.  You can answer.
3        THE WITNESS:  There were one or two before
4 that, yes, if I recall.
5        BY MR. ZIPIN:
6    Q.  Who were they?
7    A.  One of them was Ortega, I don't remember
8 the name, his girlfriend or wife, they were telling
9 me was his wife.
10   Q.  Ortega?
11   A.  I thought it was.
12   Q.  What was her position with the company?
13   A.  She was presser, shirt presser.
14   Q.  Why was it that Ortega was paid in cash?
15   A.  Same situation, she did not have the
16 paperwork and no Social Security.
17   Q.  You said there might have been another
18 person who was paid in cash?
19   A.  I don't remember who exactly it was, in
20 all these years, might have been, yeah.
21   Q.  So the other person you are thinking of

Page 39

1 you can't remember specifics, was also the same
2 thing, someone without a Social Security number?
3    A.  Must have been, I don't remember.
4    Q.  Was there any other reason why you paid
5 someone in cash and not a payroll check?
6    A.  Must have been their request, either they
7 didn't have it or just had some issues, as far as,
8 I can't say there was any other reason.
9    Q.  You mentioned Ute a few minutes ago.
10       When was Ute hired?
11   A.  I think it was in June of 2004.
12   Q.  What was Ute's position?
13   A.  He came to help Kumara, to get some of his
14 duties away from him because he was telling me he
15 had too many things to do.
16   Q.  So did he have a job title?
17   A.  Manager in front, dealing with customer
18 basically, mostly.
19   Q.  So from June of 2004, how long did Ute
20 work for you?
21   A.  April of 2005.

Page 40

1    Q.  During that time, he acted as manager in
2 the store?
3    A.  He was in charge of, in charge of the
4 front, basically, mostly dealing with customer
5 issues.
6    Q.  When Ute left, Kumara was still working
7 for you?
8    A.  Right.
9    Q.  Did you ask him if he would be manager of
10 the front the way Ute had been?
11   A.  He was always involved in the front not
12 specific, I will asking, he was always to take care
13 of customer issues.
14   Q.  You are saying Ute helped out with
15 responsibilities Kumara was otherwise doing?
16   A.  Right.
17   Q.  Did Kumara ever do any written performance
18 evaluation of other employees?
19   A.  No, this is not procedure, we never did.
20   Q.  Look at interrogatory answer number nine.
21   A.  Okay.

PRECISE REPORTING SERVICES
(301) 210-5092 (877) 4 A STENO

DEPOSITION OF FARAMARZ MAMDOUHI
Conducted on October 24, 2006

---

41

1 (Witness complies.)
2 BY MR. ZIPIN:
3 Q. Dealing with hours Mr. Kumara worked?
4 A. Yes.
5 Q. Now, you answered prior to March of 2005,
6 Mr. Kumara worked approximately 58 hour each week,
7 the amount would vary.
8 And subsequent to March of 2005, Mr.
9 Kumara worked approximately 65 hours a week.
10 The schedule was, you listed the schedule,
11 is it accurate, this schedule, you list the period
12 of time after March of 2005?
13 A. After March of 2005, as indicated, this
14 was schedule half day off on Wednesday morning or
15 afternoon.
16 Q. Before March of 2005, was there a
17 difference?
18 A. Most of the time, he was taking off
19 Wednesdays, yes, that is the difference.
20 Q. The difference is six hours or so on
21 Wednesday, otherwise the schedule was the same?

---

42

1 A. Just as far as I can tell, yeah.
2 Q. At the end of the answer, you say, In
3 addition to his lunch break, Mr. Kumara would leave
4 the store on a near daily basis to attend to
5 personal matters. He would frequently leave for
6 the day in the late afternoon as well.
7 What personal matters was Mr. Kumara
8 attending to?
9 A. I don't really know. He was going to do
10 his own stuff, he also wanted to go to the bank, to
11 send money to his parents, telling me he had a wife
12 or someone, another person counting on his money,
13 he was sending money, he had other things to take
14 care of. I don't know.
15 Q. Where did you get your information from
16 this answer, from Mr. Kumara?
17 A. Yes.
18 Q. Anybody else?
19 A. Not really.
20 Q. Just what Mr. Kumara told you?
21 A. Correct.

---

43

1 Q. How frequently is on a near daily basis he
2 would leave?
3 A. As I said, lots of times customer had
4 issues and there was nobody there to take of it, so
5 I found out, asked where Kumara was and he said he
6 had to go, wasn't this, that is what I, how I found
7 out.
8 Q. Who would you ask?
9 A. Himself, what happened, were you here, he
10 said no, and Ute was the one telling me that he
11 wasn't there, he was leaving in the afternoon when
12 we had part timer coming in and he would leave
13 after that a lot of time.
14 Q. You didn't keep track of the hours Mr.
15 Kumara was not in the store?
16 A. Not really.
17 Q. You have no way to know how many hours?
18 A. Because he was salary, it wasn't
19 important, we didn't care that much, as long as he
20 took care of the whole thing.
21 Q. It says, He frequently would leave for the

---

44

1 day in the late afternoon.
2 How frequently are you aware he would
3 leave for the day in the late afternoon?
4 A. As far as I can say, a day or two.
5 Q. You didn't keep track of those days,
6 whatever they may have been?
7 A. No.
8 Q. Look at number 14, interrogatory 14, which
9 asks, Do you contend that you do not owe plaintiff
10 overtime wages and/or minimum wages as alleged in
11 the complaint? If yes, state all reasons why you
12 so contend, including any exemptions claimed.
13 Do you see your answer there?
14 A. Yes.
15 Q. What is your claim as to why Mr. Kumara is
16 not entitled to overtime pay?
17 MR. EMIG: Asking for a legal basis?
18 MR. ZIPIN: Yes.
19 MR. EMIG: He is not an attorney. You can
20 read the answer he gave in response.
21 MR. ZIPIN: I want to know whether the

---

**Page 45**

1  claim is he was an administrative employee or there
2  is a claim he was an executive employee.
3      I don't know what the answer is.
4      I think we are entitled, I would like to
5  find out the basis.
6      MR. EMIG: He is here to testify about
7  fact not executive or administrative.
8      BY MR. ZIPIN:
9      Q.   You can answer why.
10     A.   Because he was an administrative employee
11 and he was in charge of the store, I don't think
12 overtime would, just he would not fall in that
13 category.
14     Q.   What investigation did you do to make that
15 determination he wasn't eligible for overtime?
16     A.   Because I always knew that someone was in
17 charge of managerial, administration office, they
18 didn't get overtime.
19     Q.   My question was: What investigation did
20 you do to determine.
21     That is the answer? You didn't do any

**Page 46**

1  investigation?
2      A.   I don't know. I read papers and I have
3  documents, at one time I was reading, I knew about
4  it from the beginning. I don't remember exactly
5  where I got that. I knew it all the time.
6      Q.   You read the papers, what papers?
7      A.   Sir, I don't remember, this is talking a
8  long time ago, all these years, I don't remember
9  what paper.
10     I remember I knew administrative employees
11 are not included in overtime pay. That is why we
12 want manager from the beginning.
13     Q.   You did not check with your attorney
14 regarding this person who was going to be exempt
15 from overtime?
16     A.   No.
17     Q.   You didn't check with anybody else for
18 that matter, other than the papers you read?
19     A.   I don't recall. I am sure I talked to ---
20 this I don't remember exactly who, I know for a
21 fact I knew I was sure that administrative employee

**Page 47**

1  does not get overtime.
2      Q.   As we sit here, do you remember talking to
3  anybody in particular, any individual, regarding
4  whether Mr. Kumara would be eligible for overtime
5  or not?
6      A.   I don't recall.
7      Q.   You state in here, in this answer, His
8  responsibilities did not include the dry cleaning
9  type work performed by the labor force at the dry
10 cleaning store.
11     What is dry cleaning type work?
12     A.   Basically, someone who does pressing and
13 all the work individual people do --- cleaning
14 washing, cleaning and pressing.
15     Q.   Is cleaning, pressing and washing --- is
16 that the same thing as operating the dry cleaning
17 machines is that what someone who does every day
18 work, he was not doing on a day-to-day basis?
19     A.   Once in a while, he had to do that work,
20 dry cleaning operation.
21     Q.   Is that the same thing we are talking

**Page 48**

1  about, then, operating the dry cleaning machine,
2  same as what you are mentioning, the pressing,
3  cleaning, washing?
4      A.   No, pressing is completely different.
5      Q.   Talking about cleaning.
6      A.   Just cleaning, washing is different.
7      Q.   Cleaning is the same thing as operating
8  the dry cleaning machines?
9      A.   Correct.
10     Q.   Interrogatory number 18 asks you, Identify
11 all persons responsible for determining whether or
12 not to pay plaintiff at the overtime rate, time and
13 a half, for hours worked over 40 in a given week.
14     Answer, the decision to pay Mr. Kumara's
15 salary was a corporate decision.
16     Who made that decision?
17     A corporation acts through individuals.
18     A.   Me and my partner discussed it when we
19 offered a salary.
20     Q.   Mr. Nezam?
21     A.   Yes.

DEPOSITION OF FARAMARZ MAMDOUHI
Conducted on October 24, 2006

49

1   Q.  In 2005, did any other employees working
2   at the Parklane store receive overtime pay?
3       MR. EMIG:  Objection.  Assumes overtime
4   hours were worked.
5       Go ahead and answer.
6       THE WITNESS:  What do you mean by
7   overtime?
8       BY MR. ZIPIN:
9   Q.  I mean being paid time and a half for
10  hours over 40 in a week.
11  A.  There were a couple of people working
12  every other Saturday and they were getting paid for
13  four, five hours work around $8 to $9.
14  Q.  Would that be paid by check or in cash?
15  A.  Cash.
16  Q.  As far as the paychecks go, there were
17  never any paychecks that reflected overtime
18  payment?
19  A.  No because they never worked overtime, the
20  one we talked, whoever worked overtime that got
21  paid, as I said, the person got paid cash.

50

1   Q.  They were employees working overtime, but
2   they were not getting paid overtime on the payroll?
3   They were getting paid in cash?
4   A.  Correct.
5   Q.  For hours over 40 in a particular week?
6   A.  Sure.
7       MR. ZIPIN:  Let's mark this as the next
8   exhibit, Exhibit 2, please.
9       (Mamdouhi Deposition Exhibit No. 2 was
10  marked for identification.)
11      BY MR. ZIPIN:
12  Q.  Mr. Mamdouhi, I will hand you Exhibit 2 to
13  your deposition.
14      This is a series of payroll registers
15  which have the names blacked out, but appears to
16  cover most of 2005.  The first one is February 22
17  pay period ending February 22, and the last one is
18  the pay period ending November 15.  So it covers
19  most of 2005.
20      I want to ask you to confirm for me on
21  none of these payroll records is there any

51

1   indication of anybody being paid overtime or
2   working more than 80 hours in a two-week period of
3   time.
4       Would you agree?
5       MR. EMIG:  Objection.  Document speaks for
6   itself.
7       You can answer.
8       THE WITNESS:  That is how it shows, yes.
9       BY MR. ZIPIN:
10  Q.  Why did you do it in such a way you didn't
11  have overtime on the payroll records instead you
12  were paying overtime in cash?
13  A.  They were not working overtime all the
14  time, those couple of people I was talking about,
15  once in a while, if they were working over, we were
16  trying keep everybody under 40 hours, only people,
17  as I mentioned, a couple of people, three people,
18  whatever, were working and we took care of it in
19  cash.  It simplified payroll because it wasn't
20  something that happened all time.
21  Q.  Is it accurate you didn't take payroll

52

1   taxes out for money you were paying in cash?
2   A.  Correct.
3   Q.  Mr. Kumara had a cell phone he used while
4   working with you?
5   A.  Correct.
6   Q.  Did there come a time where you paid some
7   amount towards the cell phone bill?
8   A.  Yes, yes, paid more than couple of times,
9   it was a lot of times, few times on a check, rest
10  of it was added, extra money gave him to pay for
11  his phone.
12      MR. ZIPIN:  Let's mark this as the next
13  exhibit, please.
14      (Mamdouhi Deposition Exhibit No. 3 was
15  marked for identification.)
16      BY MR. ZIPIN:
17  Q.  Let me show you Exhibit 3, a copy of a
18  check from JAAM Limited to Sprint for $50.
19  A.  Sure.
20  Q.  I take it that is your signature and Mr.
21  Nezam's signature?

**Page 53**

1  A. Yes.
2  Q. Do you know what this was for?
3  A. Because we were paying for his phone, he
4  told me he was paying so much for his phone, a lot
5  of times, he would call us on his phone rather than
6  a regular phone and he was outside, we wanted to
7  find him, so I said, We will pay.
8  Q. How much did you pay?
9  A. About $50, different times, different
10 money, usually $50 a month, I would give it
11 whatever he was telling me, how much, I would give
12 it to him.
13 Q. It wasn't paid on every month, it was just
14 paid when he would give you a bill?
15 A. Not give me a bill, tell me how much it
16 was and we would give it to him.
17 Q. How frequently would Kumara ask you for
18 this payment?
19 A. Usually, I remember that started not for
20 the, against when he was, I don't know when he got
21 his phone, probably together 10, 11 times we paid a

**Page 54**

1  month.
2  Q. You are saying you probably paid 10, 11
3  time $50 at a time?
4  A. Right.
5  Q. You did that because he was using the
6  phone for business purposes, making calls to you
7  and Mehdi?
8  A. Calling for contractors for service or
9  suppliers, things like that, running the store and
10 that is why we wanted to help him out because we
11 thought it was part of the job he was doing, so we
12 have to pay for it.
13 Q. Why did you pay in check rather than cash?
14 A. A lot of time, he was late for payment and
15 we would see him, he was going to go pay it, he
16 paid himself and we just gave it to him.
17 Q. This is made out to Sprint not to Kumara?
18 A. Because we had time to go and get the
19 check, wasn't at the store, when we had advance
20 notice, otherwise, we would give it to him when he
21 told us he had to go and pay.

**Page 55**

1  Q. You would give it in cash sometimes and in
2  in this case you wrote check to Sprint?
3  A. Sure, because he was going to pay it, that
4  is why we write it to him, for him to pay the phone
5  bill.
6  Q. You agreed to sponsor Kumara for his green
7  card application?
8      MR. EMIG: Take a short break.
9      MR. ZIPIN: Okay.
10     (Discussion off the record.)
11     BY MR. ZIPIN:
12 Q. Mr. Mamdouhi, you mentioned the check that
13 I showed you, Exhibit 3, you said you gave Mr.
14 Kumara several of these checks and sometimes you
15 paid him in cash. Right?
16 A. I don't recall how many times check, I
17 guess he has copy.
18     Mostly, it was in cash.
19 Q. Will you look and provide me with any
20 other checks you have where the company paid part
21 of the Sprint bill he incurred?

**Page 56**

1  A. I will check. I don't think I have it.
2      MR. EMIG: We will look.
3      BY MR. ZIPIN:
4  Q. If you have more, please provide them.
5  A. Sure.
6      MR. ZIPIN: Let's mark this document as
7  the next exhibit, please.
8      (Mamdouhi Deposition Exhibit No. 4 was
9  marked for identification.)
10     BY MR. ZIPIN:
11 Q. I was asking you, did there come a time
12 where you supported, the company supported Mr.
13 Kumara in his application for a green card?
14 A. Yes.
15 Q. When was that? Do you recall?
16 A. Few months after he started working, he
17 came and said if we could help him out getting his
18 green card.
19     I said, in the beginning, he mentioned it
20 once, I said we have to wait and see your
21 performance and if you like us and we like you.

DEPOSITION OF FARAMARZ MAMDOUHI
Conducted on October 24, 2006

61

1  A. Yes.
2  Q. Are you aware of the fact the company
3  needed to advertise in order to determine whether
4  an American can do this?
5  A. Yes.
6  Q. Do you have copies?
7  A. I don't, but their lawyer may have, he did
8  copy in The Washington Times, it was done in The
9  Washington Times.
10 Q. Are you aware of what response you
11 received to the ad?
12 A. I remember a couple of people called, but
13 they were not qualified and didn't show up.
14 Q. In, on the form, number 14, says, State
15 and detail minimum education training and
16 experience for worker to perform satisfactory job
17 duties described item 13.
18    Do you see that?
19 A. No.
20    MR. EMIG: Right here (indicating).
21

62

1     BY MR. ZIPIN:
2  Q. Your counsel pointed it out?
3  A. Right.
4  Q. Education, high school is checked.
5  A. Okay.
6  Q. Do you know whether Mr. Kumara had a high
7  school education, high school equivalent from Sri
8  Lanka?
9  A. He said he did.
10 Q. Do you know whether he had any college
11 experience?
12 A. No, I don't know.
13 Q. Under training, none specific, strike.
14    When Mr. Kumara was hired, he was working
15 approximately 58 hours a week. Is that right?
16 A. If I said that, yes.
17 Q. He was being paid $325 per week?
18 A. Yes, $325 per week.
19 Q. So for his, if you do the division, $325
20 per week divided by about 58 hours would be
21 somewhere around $7, $6 an hour?

63

1  A. If it is, you do the math.
2  Q. We can figure it out.
3     We are in agreement on the amount you paid
4  and the hours he worked.
5     If, once he got his green card, you were
6  prepared to pay substantially more for him doing
7  alteration and tailoring?
8  A. That is what our intention was.
9  Q. Do you have alterations tailors that work
10 for you?
11 A. Yes.
12 Q. How much are they paid?
13 A. $12 an hour.
14 Q. In the Parkland store, not when Mr. Kumara
15 worked at the Parkland, is there a manager for that
16 store?
17 A. Basically, we run the store ourselves.
18 Q. You and your partner?
19 A. Yes.
20 Q. There is no manager that works in that
21 store?

64

1  A. No.
2  Q. Under the form here, this Exhibit 4, you
3  see box number 17, bottom, on the right, first
4  page, number of employee alien will supervise.
5     It says zero.
6     Is it your testimony when he received his
7  green card and assumed the position of alterations
8  tailor, he would have to have manager
9  responsibilities?
10 A. I assume that would have been the case, if
11 it happened.
12 Q. Did it ever happen?
13 A. No, he never worked as a tailor.
14 Q. There came a time where you had an action
15 brought against you with the D.C. Department of
16 Employment Services?
17 A. Yes.
18 Q. On behalf of several employees claiming
19 they were not paid overtime?
20 A. They were one person and then I assumed
21 Mr. Kumara went and got the other people involved.

16 (Pages 61 to 64)